



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 30, 2019**

*Mark X. Mullin*

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 14-40375-MXM-7 |
| ROBERT LEE EDMONDS, | § | |
| | § | CHAPTER 7 |
| DEBTOR. | § | |
| | | |
| RED HONOR VENTURES, LTD., | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | ADVERSARY NO. 14-4027 |
| | § | |
| ROBERT LEE EDMONDS, LINDA EDMONDS, | § | |
| EDMONDS PUBLISHING & MEDIA GROUP, | § | |
| LLC, | § | |
| | § | |
| DEFENDANTS. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
DETERMINING DEBT OWED TO PLAINTIFF RED HONOR VENTURES, LTD.
<u>TO BE NONDISCHARAGEABLE PURSUANT TO 11 U.S.C. § 523(a)(4) AND (a)(6)</u>**

The Court held a two-day trial to (i) liquidate all state-law claims asserted by Red Honor Ventures, Ltd. (the "*Plaintiff*") against Robert L. Edmonds (the "*Debtor*"), Linda Edmonds, and Edmonds Publishing & Media Group, LLC ("*Publishing*," and together with the Debtor and Linda Edmonds, "*the Defendants*"); and (ii) determine whether any of the Plaintiff's liquidated claims against the Debtor are nondischargeable under 11 U.S.C. § 523(a)(2), (a)(4), and (a)(6).

The Court has reviewed and considered the pleadings and briefing filed in this adversary proceeding, the testimony of witnesses, the exhibits admitted into evidence, and the arguments of counsel. The following constitutes the Court's findings of fact and conclusions of law[1] in support of this ruling as required by Federal Rule of Civil Procedure 52, made applicable in this adversary by Federal Rule of Bankruptcy Procedure 7052.

For the reasons stated below the Court finds and concludes that (i) the Plaintiff proved up liquidated state-law claims against the Debtor of $101,378.75; (ii) the Plaintiff proved that its liquidated claim constitutes a nondischargeable claim against the Debtor of $101,378.75 under § 523(a)(4) and (a)(6); (iii) the Plaintiff failed to prove a nondischargeable claim against the Debtor under § 523(a)(2); and (iv) the Debtor failed to prove any viable liquidated claims against Linda Edmonds or Publishing.

## I. BRIEF PROCEDURAL BACKGROUND

This litigation started in September 2013 in state court when the Plaintiff sued the Debtor and Publishing in the 101st District Court of Dallas County, Texas, Cause No. 13-11606 (the "*State Court Lawsuit*"), asserting state law claims arising out of the parties' business relationship.

---

[1] Any findings of fact that should more appropriately be characterized as a conclusion of law should be regarded as such, and *vice versa*.

On January 28, 2014, the Debtor filed his voluntary petition for relief under Chapter 7 of the Bankruptcy Code, staying the State Court Lawsuit.

On April 22, 2014, the Plaintiff filed a complaint against the Debtor (the "***Dischargeability Complaint***"), asserting claims under §§ 523 and 727 of the Bankruptcy Code. The Dischargeability Complaint was assigned Adversary No. 14-4027.

On July 14, 2014, the Plaintiff filed a notice of removal of the State Court Lawsuit in this Court, Fort Worth Division, initiating Adversary No. 14-4069.

On October 20, 2014, in response to Judge Lynn's concern that the first notice of removal was filed in the wrong division, the Plaintiff filed another notice of removal in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, initiating Adversary No. 14-3135. By order entered on October 30, 2014,[2] Adversary No. 14-3135 was transferred to the Fort Worth Division, where it was given a new adversary number, Adversary No. 14-4102.

Adversary Proceeding Numbers 14-4069 and 14-4102 have since been consolidated into this Adversary No. 14-4027.[3]

On April 1-2, 2019, the Court held a trial on the Plaintiff's claims that were not previously dismissed voluntarily or disposed of after rulings on dispositive motions. The Plaintiff's remaining claims are for the liquidation of its alleged state-law claims against the Defendants, and the determination of whether such liquidated claims against the Debtor are nondischargeable under § 523.

---

[2] Adv. No. 14-3135, Adv. ECF No. 6.

[3] Adv. No. 14-4027, Adv. ECF No. 40 (order consolidating 14-4102 into 14-4027); Adv. No. 14-4069, Adv. No. 21 (order consolidating 14-4069 into 14-4027); Adv. No. 14-4102, Adv. No. 11 (duplicate order consolidating 14-4102 into 14-4027). Unless otherwise noted, subsequent references in this document to Adversary ECF numbers are to those in Adv. No. 14-4027.

## II.   JURISDICTION AND VENUE

The Court has subject matter jurisdiction over these consolidated adversary proceedings pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the standing order of reference in this district. These consolidated adversary proceedings constitute core proceedings over which the Court has both statutory and constitutional authority to enter final orders and judgments pursuant to 28 U.S.C. § 157(b)(2)(A), (I), and (O).  Even if this Court would not otherwise have the authority to enter a final judgment, the Court finds that the parties have consented to the Court's issuance of a final judgment in these proceedings.[4]  Venue is proper pursuant to 28 U.S.C. § 1409(a).

## III.   FACTUAL HISTORY[5]

### A.   Formation of the Plaintiff and Management

In April 2006, the Debtor, Mr. Greg White (now deceased), and Mr. David Scott were all substantial supporters of the Boy Scouts of America.  All three were Eagle Scouts and two of them worked as volunteers at the Scout's national headquarters in Irving, Texas.  Believing the National Scouting Museum needed a museum guide, the three of them decided to produce it and donate the guide to the Scouts.  They wanted to operate under a legal umbrella to produce the guide, to produce other original-content publications, and to publish and distribute books of third parties, so they formed the Plaintiff, Red Honor Ventures, Ltd., a Texas limited partnership, and Red Honor Management, Inc. ("***Management***"), the general partner of the Plaintiff.  Pursuant to the *Limited Partnership Agreement of Red Honor Ventures, Ltd.* (the "***Partnership Agreement***"), the general

---

[4] *See Wellness Int'l Network, Ltd. V. Sharif*, 135 S. Ct. 1932, 1948-49 (2015).

[5] Some of these facts were proven at trial and some are also from *Plaintiff and Defendant Robert Edmonds Stipulated Facts*, Adv. ECF No. 93 (the "***Stipulated Facts***," and each a "***Stipulated Fact***").  Although Linda Edmonds did not sign on to the Stipulated Facts, she did not contest any of them.

partner (Management) was to manage and control the business affairs of the Plaintiff.[6] The Debtor, White, and Scott were limited partners of the Plaintiff.

## B. Limited Partners' initial capital contributions

The Debtor, White, and Scott agreed to contribute $10,000 each as their initial capital contributions to the Plaintiff to acquire their respective limited partnership interests.[7] White and Scott made their required capital contributions. Even though the Debtor testified under oath at a deposition that he made his required capital contribution at the Plaintiff's formation,[8] he stipulates now that he never made his required $10,000 contribution.[9] Because the Debtor kept the Plaintiff's books and records from 2006-2013, and because Scott never sought to review the Plaintiff's books and records, Scott did not discover that the Debtor failed to make his required initial $10,000 capital contribution until years later, as detailed below.

## C. Day-to-day business operations of the Plaintiff and use of Plaintiff's funds

Because White and Scott had full time jobs that required their attention, all three limited partners agreed that the Debtor would be the president of Management and handle the day-to-day business operations of the Plaintiff. Even though all three limited partners agreed that the Debtor

---

[6] Partnership Agreement § 3.01, Pl.'s Exs. 1, 23D. Two versions of the Partnership Agreement were admitted into evidence, both of which are unsigned. Pl.'s Exs. 1, 23D. The versions of the Partnership Agreement are not identical, but the parties have not cited to, and the Court has not found, any meaningful difference between the two documents on any material issue. Both the Plaintiff and the Debtor appear to agree that the unsigned Partnership Agreement is indeed the binding agreement for the Plaintiff.

[7] *See, e.g.,* Partnership Agreement § 2.01.A, Pl.'s Exs. 1, 23D. Under § 2.01.A of the Partnership Agreement, the limited partners of the Plaintiff and the limited partnership units held by each are supposed to be set forth on a Schedule 2.01. Plaintiff's Exhibit 1 has no such schedule attached, and Plaintiff's Exhibit 23D has a Schedule 2.01 attached, but it is blank. Based on the testimony of the witnesses, it appears that the Debtor, White, and Scott each initially owned 1/3 of the limited partnership interests, which also matches those individuals' respective ownership percentages of Management. *See* Exhibit A to [unsigned] *Shareholders' Agreement between Red Honor Management Inc. and its Shareholders* dated April 1, 2006, Pl.'s Ex. 23 (reflecting that the Debtor, White, and Scott each owned 33 1/3% of Management).

[8] Edmonds Depo. at 45-46, Pl.'s Ex. 3.

[9] Stipulated Fact No. 7.

5

would handle the day-to-day business operations of the Plaintiff, neither the Plaintiff, Management, nor any of the limited partners ever agreed, whether in writing or (as between the individuals) verbally, how the Debtor would be compensated for his work running the day-to-day affairs of the Plaintiff. The parties also never agreed, in the Partnership Agreement or otherwise, to authorize distributions to the limited partners, other than in accordance with their respective percentage interests.[10]

According to Scott's testimony, however, the limited partners did verbally agreed that the Debtor and Scott (both of whom were authors) each would be able to keep (a) "commissions," or up-front money for agreeing to write books, and (b) "royalties" from the sale proceeds of their authored books, or as Scott put it, "Like, ten percent on the -- on the sale price of a book we would receive as a -- as a royalty for authoring the book."[11] Scott further testified that there was never an agreement that the Debtor could use the Plaintiff's funds for his own personal use.[12]

The Debtor's testimony regarding authorized distributions and the use of the Plaintiff's funds varied. The Debtor agreed with Scott's testimony that the limited partners agreed it was okay for the Plaintiff to pay "royalties" (a percentage of sales) or "commissions" to Scott and the Debtor for books they had agreed to write.[13] But contrary to Scott's testimony, the Debtor's testimony seemed to suggest that the limited partners agreed that each limited partner could keep *all* the proceeds from the sale of that partner's books, not merely a "royalty" or percentage of sale proceeds.[14] The Debtor also testified—directly contrary to Scott's testimony—that Scott knew the

---

[10] Partnership Agreement §§ 2.02A, 4.03, Pl.'s Exs. 1, 23D.

[11] 4/1/2019 Trial Tr. at 30-31. The April 1, 2019 trial transcript is found at Adv. ECF No. 106.

[12] 4/1/2019 Trial Tr. at 32-33.

[13] 4/1/2019 Trial Tr. at 184.

[14] 4/1/2019 Trial Tr. at 188.

Debtor was taking money out of the Plaintiff for his own personal expenses and that it "was perfectly fine" with Scott.[15]  According to the Debtor, Scott knew that he needed cash for general household living expenses and that "Scott would always say, "'I can't see you fail, I can't let you die.'"[16]  This difference in the parties' testimony becomes material regarding (i) Scott's and the Debtor's receipt of "commissions" and "royalties" as authors, and (ii) the Debtor's use of the Plaintiff's funds for his own personal expenses.

### D.       Debtor's misappropriation of Plaintiff's funds for personal use

From 2006-2013, during the Debtor's periods of unemployment, the Debtor admitted in his testimony that he used roughly $150,000 of the Plaintiff's funds for his own personal expenses.[17]  For example, but not by way of limitation, the Debtor admitted that he used his access to the Plaintiff's checking account to write at least four checks to make mortgage payments on the home that he and Linda Edmonds own jointly (the "***Home***").

To justify, in part, his use of the Plaintiff's funds, the Debtor testified that (a) the Plaintiff had received approximately $107,000 in total revenue from the sale of his best-selling faith-and-prayer book, *In Our Own Way*,[18] and (b) he was entitled to the entire $107,000 that the Plaintiff had been paid for the book (as opposed to a 10% royalty). Therefore, according to the Debtor, he was entitled to such funds and he did not misappropriate any of the Plaintiff's funds.

### E.       Debtor's usurpation of Plaintiff's corporate opportunity

In October or November 2012, the Plaintiff entered into a contract with "Methodist Men," a division of the Methodist Church, to print and distribute *Strength for Service*, a Methodist Men

---

[15] 4/1/2019 Trial Tr. at 155.

[16] 4/1/2019 Trial Tr. at 155.

[17] 4/1/2019 Trial Tr. at 170-71.

[18] 4/1/2019 Trial Tr. at 162-63.

publication. Rather than profiting from this transaction, the Plaintiff lost this business opportunity because the Debtor surreptitiously set up Publishing,[19] which—without Scott's knowledge—printed and distributed the book for Methodist Men.[20] When asked how much profit the Plaintiff would have expected to receive from this contract, Scott testified, "I would have expected, over time, multiple orders from the Methodist Men, in excess of 50,000 dollars."[21]

**F.    Scott discovers the Debtor's failure to make his initial capital contribution and misappropriation of Plaintiff's funds**

In December 2012, the Debtor made a frantic call to Scott to inform him that the Plaintiff did not have enough money to pay its bills. Even though Scott had not previously reviewed the Plaintiff's books and records, Scott testified that he was surprised by the call because he "thought we had lots of money." Scott thought that the Plaintiff was about to receive a final check for the Circle Ten Counsel history book which should have provided sufficient funds for the Plaintiff to pay any outstanding bills.[22] Therefore, Scott asked the Debtor for the Plaintiff's books and records in January 2013. Upon receiving the requested records in February 2013, Scott discovered that the Debtor never made his initial $10,000 capital contribution and that the Debtor was misappropriating the Plaintiff's funds for the Debtor's own personal use and expenses. Shortly thereafter, the Debtor resigned from the Plaintiff in February 2013.

The Debtor testified that—shortly before his resignation—he deposited $21,500 into the Plaintiff's account to try to leave the company solvent and to reimburse the Plaintiff for any funds that he may have previously withdrawn for his own personal use and expenses. The Plaintiff's

---

[19] Publishing is owned by the Debtor and Linda Edmonds.

[20] Methodist Men, later known as Strength for Service, Inc., sued Publishing for book sales that Publishing never turned over to Methodist Men. *See* Pl.'s Exs. 17-19.

[21] 4/1/2019 Trial Tr. at 65-67.

[22] 4/1/2019 Trial Tr. at 41.

bank records reflect a $21,500 deposit on February 5, 2013.[23]   The Debtor also testified that he

wrote a $5,000 personal check to cover the expenses of the photographer for a book Scott was

writing,[24] but there is no documentary evidence to substantiate that allegation or deposit into the

Plaintiff's bank account.

### G.      Plaintiff files State Court Lawsuit

In September 2013, the Plaintiff filed the State Court Lawsuit against the Debtor and

Publishing, later adding Linda Edmonds as a defendant.  The *Plaintiff's Third Amended Original*

*Petition for Injunctive Relief and Damages* (the "***Third Amended Petition***"), filed on December

10, 2013 in state court and now the live pleading in this Court—

- asserts causes of action for (a) breach of fiduciary duty; (b) conversion and unjust
  enrichment; and (c) declaratory judgment as to the ownership of intellectual
  property rights (namely, the distribution rights to all versions of the books *Strength*
  *for Service* and *In Our Own Way*);

- seeks temporary and permanent injunctive relief requiring (i) the turnover of any
  sale proceeds from *Strength for Service* and *In Our Own Way*; and (ii) a
  constructive trust upon the Home and on upon any real property owned by Linda
  Edmonds; and

- requests an award of exemplary damages, attorney's fees, pre- and post-judgment
  interest, and costs.

---

[23] Pl.'s Ex. 13 (including, among others, bank statement for the period ending 2/28/2013).

[24] 4/1/2019 Trial Tr. at 166-67.

### H.      Debtor files bankruptcy and Plaintiff files Dischargeability Complaint

The Debtor filed his bankruptcy case on January 14, 2014, and on April 22, 2014, the Plaintiff filed the Dischargeability Complaint.  The allegations in the Dischargeability Complaint largely mirror those in the Third Amended Petition.   The Dischargeability Complaint asserts causes of action—

- under § 523(a)(2)(A) for false pretenses or false representations;

- under § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

- under § 523(a)(6) for willful and malicious injury to another entity or to the property of another entity;

- under § 727(a)(2)(A) for transfer and concealment of assets; and

- under § 727(a)(4) for making a false oath or account.

The Plaintiff voluntarily dismissed its claims under § 727,[25] and the Court denied dispositive motions requesting dismissal of, or summary judgment on, the Plaintiff's other claims.[26]

On April 1-2, 2019, the court held a trial on the Plaintiff's state-law claims and § 523 claims.  The parties requested the opportunity to file post-trial briefs, and the parties later asked for extensions of the deadlines to file such briefs, which the Court granted.  The last post-trial brief was filed on July 29, 2019.

---

[25] *See* Adv. ECF No. 34 (Plaintiff's motion to voluntarily dismiss § 727 counts); Adv. ECF No. 36 (order dismissing § 727 counts).

[26] *See* Adv. ECF No. 25 (order denying motion of the Debtor to dismiss claims); Adv. ECF No. 49 (order denying motion of Linda Edmonds and Publishing to dismiss claims); Adv. ECF No. 50 (order denying motion of Linda Edmonds and Publishing for summary judgment).

## IV.   LEGAL ANALYSIS

The Court first must liquidate the claims asserted in the Third Amended Petition.  The Court then must determine whether any such liquidated claims, or any other claims asserted in the Dischargeability Complaint, are nondischargeable under § 523.

### A.   Claims and requests for relief asserted in the Third Amended Petition

The Court will address the claims and requests for relief in the Third Amended Petition in turn.

### 1.   *Breach of fiduciary duty*

The elements of a claim for breach of fiduciary duty are:  1) there is a fiduciary relationship between the plaintiff and defendant; 2) the defendant breached his fiduciary duty to the plaintiff; and 3) the defendant's breach proximately caused injury to the plaintiff or benefit to the defendant.[27]

The issue of whether the Debtor owed a fiduciary duty to the Plaintiff under state law is largely the same issue as whether the Debtor was acting in a fiduciary capacity for purposes of § 523(a)(4), so the Court will address the fiduciary claims against the Debtor below.

There is no evidence that Linda Edmonds or Publishing owed a fiduciary duty to the Plaintiff, so the fiduciary claims fail as to those defendants.

### 2.   *Conversion*

A conversion of personal property occurs upon the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or

---

[27] *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.- Dallas 2006, pet. denied).

11

inconsistent with, the owner's rights.[28]   The Plaintiff complains of the following alleged acts of conversion:

- ### *The Debtor's failure to make his initial $10,000 contribution*

Although the Debtor was contractually obligated to make his initial $10,000 contribution to the Plaintiff to acquire his limited partnership interest, the Debtor never made that contribution, so the Plaintiff never was paid the $10,000.  Although the Plaintiff may be able to establish a valid claim for the failed contribution under other legal theories, based on the record in this case, the Court does not find the Debtor's failure to make his contribution constitutes conversion, so this claim for conversion fails.

- ### *Checks written to Linda Edmonds*

The Plaintiff complains of three checks written by the Debtor on the Plaintiff's bank accounts to Linda Edmonds for her personal use.  The Debtor testified without contradiction, however, that the checks were for the Debtor's personal expenses.  The Debtor made the checks payable to Linda Edmonds solely as a matter of convenience so that Linda Edmonds could deposit the checks into a bank account that they share, but that is in the name of only Linda Edmonds. Under these circumstances, the Court finds and concludes that the Debtor, not Linda Edmonds, committed the act of conversion, as addressed more fully below.  Therefore, the conversion claim against Linda Edmonds fails.

- ### *Unauthorized personal expenses of the Debtor*

---

[28] *Pipes v. Hemingway*, 358 S.W.3d 438, 449-50 (Tex. App.--Dallas 2012, no pet.).

12

Unless there was an agreement for the Debtor to use the Plaintiff's funds for the Debtor's personal expenses, there was unquestionably a conversion, as the Debtor misappropriated the Plaintiff's funds to the exclusion of, and inconsistent with, the Plaintiff's rights.

The Court finds that Scott's testimony was more credible than the Debtor's on the issue of the parties' verbal agreements regarding the taking and use of the Plaintiff's funds. The Court finds and concludes that the parties agreed that the Debtor and Scott each were permitted to keep (a) "commissions," or up-front money for agreeing to write books, and (b) a 10% royalty from the sale proceeds of their authored books. There was no agreement that the Debtor could use the Plaintiff's funds for personal use or that each limited partner would be able to keep all of the proceeds from their own authored books.

In the Plaintiff's proposed findings of fact and conclusions of law, the Plaintiff alleged that the Debtor misappropriated $294,867.86 of the Plaintiff's funds to pay his personal expenses.[29] During closing arguments, however, the Plaintiff's counsel admitted that he miscalculated the damages, and that Scott's testimony properly reflected the damages. Scott testified that the Debtor spent "around $234,000" of the Plaintiff's funds for personal expenses, as reflected in a spreadsheet prepared by Scott.[30] But that spreadsheet, found in Plaintiff's Exhibit 2, reflects instead a total of $133,578.75. During closing arguments, the Plaintiff's counsel assured the Court that the "238,000 is there"[31] and that it was simply difficult to read the hard copy of the spreadsheet that was provided as Exhibit 2. The parties agreed during closing argument that the Plaintiff could

---

[29] *Plaintiff's Second Amended Proposed Findings of Fact and Conclusions of Law*, Adv. ECF No. 92, ¶ 25.

[30] 4/1/2019 Trial Tr. at 57.

[31] 4/2/2019 Trial Tr. at 27. The April 2, 2019 trial transcript is found at Adv. ECF No. 105.

provide the Court with an electronic version of Exhibit 2 containing detail of the expenses, and the Court has since reviewed that electronic version of Exhibit 2.[32]

It is clear from the electronic version of the Excel spreadsheet that the total in column D of asserted unauthorized expenses is $133,578.75. The spreadsheet then breaks down those expenses into various categories (each in its own column, columns F through W), such as "Restaurant," "Entertainment," "Home Items," and "postage." It appears that Plaintiff's counsel double-counted the expenses by adding the broken-out expenses from columns F through W to the original total in column D. Even though the Plaintiff's spreadsheet is not free from error,[33] the Court finds that the Scott testimony and Exhibit 2 (as supplemented by the electronic Excel spreadsheet) establish that the Debtor misappropriated $133,578.75 of the Plaintiff's funds.

The Court further finds that the Debtor is entitled to two credits that reduce the Plaitinff's $133,578.75 of damages from the misappropriated funds. First, the Debtor was entitled to receive a 10% royalty on the $107,000 of books sales received by the Plaintiff from the Debtor's book, *In Our Own Way*. Therefore, the Debtor is allowed a credit of $10,700. Second, the Debtor testified, without contradiction, that he deposited $21,500 into the Plaintiff's account to reimburse the Plaintiff for funds that Debtor had used to pay his personal expenses, and that deposit is reflected in the Plaintiff's bank records.[34] Therefore, the Court will give the Debtor an additional credit of $21,500. The Debtor also testified that he was entitled to an additional credit of $5,000 for a personal payment he made to a photographer on behalf of the Plaintiff, but there is insufficient

---

[32] The Excel file is named, "Edmonds Charges_131011.xlsx".

[33] There appear to be minor miscalculations of the broken-out expenses because columns F through W total $131,796.07, a slight variation from the total in column D, $133,578.75.

[34] Pl.'s Ex. 13 (including, among others, bank statement for the period ending 2/28/2013).

credible evidence to corroborate the Debtor's testimony, so the Court will not deduct that number from the total damages.

Based on the foregoing evidence and legal authorities, the Court finds and concludes that the Plaintiff has proven a conversion claim against the Debtor of $101,378.75.[35]

- ***Lost profits from the "Strength for Service" publication***

The credible evidence reflects that the Plaintiff won the contract to publish and distribute *Strength for Service* for Methodist Men, a division of the Methodist Church, but that the Debtor set up Publishing to take that corporate opportunity away from the Plaintiff. The Plaintiff, however, failed to prove damages for this conversion because when asked how much profit the Plaintiff expected to receive from this contract, Scott testified, "I would have expected, over time, multiple orders from the Methodist Men, in excess of 50,000 dollars."[36] The Court interprets Scott's testimony to be his estimate of the gross sale proceeds from the book. There was no evidence of the costs and expenses the Plaintiff would have incurred in publishing and distributing the book, so the Court is not able to determine the amount, if any, of lost profits that the Debtor and Publishing converted from the Plaintiff. Therefore, the Plaintiff's *Strength for Service* conversion claim fails.

### 3.    *Unjust enrichment*

The equitable doctrine[37] of unjust enrichment allows a party to recover damages from another party who, by fraud, duress, or taking undue advantage, wrongfully secured a benefit that

---

[35] $133,578.75 - $10,700 - $21,500 = $101,378.75.

[36] 4/1/2019 Trial Tr. at 65-67.

[37] Unjust enrichment applies in the absence of express contractual agreements, which would give rise to adequate legal remedies. *BMG Direct Marketing, Inc. v. Peake*, 178 S.W.3d. 763 (Tex. 2005).

would be unconscionable to retain.[38] To recover under such a theory, the harmed party must allege more than just a bad bargain.[39] The benefit retained or loss to another must be so unjust as to upset fundamental principles of justice, equity, and good conscience.[40]

For the reasons already described above, the Debtor, by taking undue advantage of his control over the Plaintiff's bank account and debit cards, wrongfully secured a benefit of $101,378.75 that would be unconscionable to retain. Therefore, the Plaintiff is entitled to an unjust-enrichment claim against the Debtor in that amount.[41]

### 4. *Declaratory judgment*

This request for relief was not addressed at trial and appears to be moot. The Debtor does not appear to dispute the Plaintiff's distribution rights to all versions of the books *Strength for Service* and *In Our Own Way*. The contested issue of the Debtor's alleged entitlement to some or all of the proceeds of *In Our Own Way* is addressed elsewhere in these Findings and Conclusions.

### 5. *Injunctive relief requiring turnover of sale proceeds*

This request for relief was not addressed at trial and appears to be moot. The Plaintiff has an unsecured claim against the Debtor, and the dischargeability of that claim is addressed elsewhere in these Findings and Conclusions. Turnover relief is not appropriate under the circumstances.

---

[38] 64 Tex. Jur. 3d. § 14 (2019) (citing *Protocol Technologies, Inc. v. J.B. Grand Canyon Dairy, L.P.*, 2013 WL 1248289 (Tex. App—Eastland 2013)).

[39] *First Union Nat. Bank v. Richmont Capital Partners I, L.P.*, 168 S.W. 917 (Tex. App.—Dallas 2005).

[40] *Allen v. Berrey*, 645 S.W.2d. 550 (Tex. App.—San Antonio 1982) *writ refused n.r.e.* (Mar. 30, 1983).

[41] These damages are not added to the conversion damages in the same amount. Instead, the Plaintiff is entitled to a single claim of $101,378.75 under both a conversion theory and unjust-enrichment theory.

### 6.      *Constructive trust*

Plaintiff asks for a constructive trust on the Home or other real property of Linda Edmonds, primarily to rectify the Debtor's use of the Plaintiff's funds to make mortgage payments on the Home.  A constructive trust is an equitable remedy imposed when property is acquired under fraudulent means.[42]  Fashioned as a remedy rather than a cause of action,[43] a constructive trust prevents unjust enrichment by allowing a party to claim equitable ownership in the subject property and to assert the rights of a lien creditor.[44]  Such a remedy is appropriate when a party retains property through fraud or a breach of a fiduciary and allowing that party to keep the property would result in unjust enrichment.[45]

The Debtor stipulated that from 2006-2013, the Debtor wrote at least four checks on the Plaintiff's checking account to pay for the mortgage on the Home.[46]  But the Plaintiff never specified how much the mortgage payments were and never pointed out where, in the voluminous exhibits containing bank records, the line items were for the mortgage payments.  Given the scarcity of evidence on the mortgage payments, and given the Plaintiff's failure to prove any claims against Linda Edmonds (the co-owner of the Home), the Court declines to exercise whatever discretion and authority it may have to impose a constructive trust on the Home.

---

[42] 64 Tex. Jur. 3d. § 59 (2019) (citing *Thigpen v. Locke* (363 S.W.2d. 247 (Tex. 1962)).

[43] *Sherer v. Sherer*, 393 S.W.3d. 480 (Tex. App.—Texarkana 2013) *reh'g overruled* (Feb. 6, 2013), *review denied* (Apr. 12, 2013).

[44] *Marathon Mach. Tools, Inc. v. Davis-Lynch, Inc.*, 400 S.W.3d. 133 (Tex. App.—Houston 14th Dist. 2013).

[45] *In re Presto*, 376 B.R. 554 (Bankr. S.D. Tex. 2007) (applying Texas law); *In re Marriage of Nolder*, 48 S.W.3d 432 (Tex. App.—Texarkana 2001).

[46] Stipulated Fact #22, Adv. ECF No. 92.

### B. Claims in the Dischargeability Complaint

To except a debtor's debt from discharge under 11 U.S.C. § 523(a)(2), (a)(4), or (a)(6), a plaintiff creditor must prove its claim by a preponderance of the evidence.[47]   In this case, the Plaintiff has met its burden as to some claims but not others as detailed below.

### 1. Section 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code provides that a debt will not be discharged to the extent the debt was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[48]   The Plaintiff's Dischargeability Complaint alleges false pretenses and false representations (but not fraud) in the § 523(a)(2)(A) count.   Specifically, the Plaintiff alleges that the Debtor told Scott and White that the Plaintiff was either losing money or just breaking even while misappropriating the Plaintiff's funds for personal purposes.   Further, the Debtor never told Scott or White about the financial affairs of the Plaintiff or provided to them the Plaintiff's bank statements, knowing that such disclosures would reveal the Debtor's illicit use of the Plaintiff's funds.   Finally, the Plaintiff does not specifically allege in the Dischargeability Complaint that the Debtor's failure to contribute his $10,000 is actionable under § 523(a)(2)(A), but the Court will also address the contribution issue out of an abundance of caution.

False representation and false pretenses require the creditor to prove (i) the existence of a knowing and fraudulent falsehood, (ii) describing *past or current facts*, (iii) that was relied upon by the creditor.[49]   A debtor's promise related to a future action that does not purport to depict a

---

[47] *See, e.g., Grogan v Garner*, 498 U.S. 279, 289-91 (1991).

[48] 11 U.S.C. § 523(a)(2)(A).

[49] *In re Allison*, 960 F.2d 481, 483 (5th Cir. 1992).

current or past fact does not qualify as a false representation or a false pretense.[50]  In other words,

a mere promise to be performed in the future is not sufficient to make a debt nondischargeable,

even though there is no excuse for the subsequent breach.[51]

First, the Debtor's promise to contribute $10,000 is a mere promise to be performed in the

future and is not sufficient to make the debt nondischargeable, even though there is no excuse for

the Debtor's subsequent breach of that promise.

Second, the Plaintiff has not shown any falsity in the Debtor's alleged statement that the

Plaintiff was losing money or just breaking even.  Even if the money the Debtor took out for

personal use had not been taken out, would those extra funds have made the Plaintiff profitable?

The Court cannot answer that question because there is insufficient credible evidence to

demonstrate how far under water (or not) the misappropriated funds made the Plaintiff.

Third, it is difficult to give much credence to Scott's complaint that the Debtor never told

him about the Plaintiff's financial affairs or provided Scott with copies of the Plaintiff's bank

statements.  Scott was a limited partner who also had fiduciary duties to the Plaintiff.  There is no

evidence that Scott ever asked to see the Plaintiff's financial records until the very end of the

Debtor's tenure there, and there is no evidence that the Debtor ever hid or refused to provide such

records to Scott.

Finally, the Plaintiff has not quantified any damages from the Debtor's alleged statements

about the financial affairs of the Plaintiff or from the Debtor's alleged failure to provide bank

---

[50] *In re Bercier*, 934 F.2d 689, 692 (5th Cir. 1991) (overruled on other grounds by *Husky Intern. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581 (2016)).  *Husky* made clear that no misrepresentation is necessary to establish an "actual fraud" under § 523(a)(2)(A) of the Bankruptcy Code.  Courts in the Fifth Circuit continue to follow *Bercier*'s requirement that a "false representation" under § 523(a)(2)(A) must relate to past or current facts.  *See, e.g., In re Carter,* No. 17-35082, 2018 WL 6060391, at *23 (Bankr. S.D. Tex. Nov. 19, 2018); *In re Martin*, No. 15-41103, 2017 WL 1316928, at *10 (Bankr. E.D. Tex. Apr. 7, 2017).

[51] *In re Bercier*, 934 F.2d at 692 (citing 3 Collier on Bankruptcy 15th. Ed. § 523.08[4]).

statements, other than perhaps just the amount of misappropriated funds. Those damages are addressed in the next section on § 523(a)(4).

Under these circumstances, the Court finds and concludes that the Plaintiff's § 523(a)(2)(A) claim for misrepresentations fails.

### 2.    Section 523(a)(4)

Section 523 (a)(4) of the Bankruptcy Code does not allow the "discharge [of] an individual from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]"[52] The Plaintiff's claims are the same as those described in the Third Amended Petition: (i) the Debtor's failure to make his $10,000 contribution; (ii) the Debtor's use of the Plaintiff's funds for personal use; and (c) the Debtor's actions in improperly usurping the Plaintiff's opportunity by setting up Publishing to print and distribute the Methodist Men's book *Strength for Service.*

### a)    Defalcation while acting in a fiduciary capacity

Defalcation is a broad term that occurs when a breach or willful neglect of a fiduciary obligation occurs, even if not accompanied by embezzlement or larceny.[53] This section applies to debts incurred by a debtor's abuse of his fiduciary position to acquire or use property not belonging to him.[54] To bar discharge, the debtor must have been acting in a fiduciary capacity at the time of the alleged defalcation. Thus, as a threshold matter, this Court must first determine whether the

---

[52] 11 U.S.C. § 523(a)(4). Because the Court concludes that the Debtor committed a defalcation while acting in a fiduciary capacity, the Court need not address whether the Debtor's actions also constituted fraud for purposes of § 523(a)(4).

[53] *In re Rifai*, No. 18-34513, 2019 WL 3804456 (Bankr. S.D. Tex. Aug. 13, 2019) (citing *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013)).

[54] *In re Harwood*, 637 F.3d 615, 619 (5th Cir. 2011).

Debtor was acting in a fiduciary capacity. Then, if so, the Court must consider whether a defalcation occurred.[55]

*Fiduciary Capacity.* While the scope of fiduciary duties is determined by federal law, federal courts, including the Fifth Circuit, often look to state law to determine whether an obligation exists.[56] For example, in *In re Harwood*, the Fifth Circuit relied on *Crenshaw v. Swenson* to hold that a managing partner of a partnership's general partner owed the underlying partners "the highest fiduciary duty recognized in the law."[57] In accordance with state law, the court observed that the amount of control the director had over the company, and the confidence and trust placed into the director's hands in managing the company's operations, determined the scope of the director's fiduciary duties. Where the business relationship shows that the director has a requisite degree of control over the business, and the director holds a considerable degree of trust from other partners, that director "act[s] in a fiduciary capacity . . . within the meaning of Section 523(a)(4)."[58]

In this case, the Partnership Agreement provides that each partner (including limited partners) agrees to act as a fiduciary of the Plaintiff with respect to matters of noncompetition, confidentiality, and other business opportunities.[59] The Partnership Agreement also provides that

---

[55] *In re Rifai*, No. 18-34513, 2019 WL 3804456 (Bankr. S.D. Tex. Aug. 13, 2019); *In re Koch*, No. 85–01547R, 1987 WL 961014 (E.D. Va. Apr. 7, 1987).

[56] *In re Harwood*, 637 F.3d 615, 619 (5th Cir. 2011).

[57] *Harwood*, 637 F.3d at 620 (quoting *Crenshaw v. Swenson*, 611 S.W.2d. 886 (Tex.Civ.App—Austin 1980)); *see also LSP Investment Partnership v. Bennett (In re Bennett)*, 989 F.2d. 779 (5th Cir. 1993).

[58] *Harwood*, 637 F.3d at 622–24.

[59] Partnership Agreement § 9.04.A.

"[e]ach Partner shall conduct the affairs of the Partnership in good faith toward the best interests of the Partnership."[60]

In addition, the Debtor was President of Management, which was the Plaintiff's general partner. The Debtor was sole signatory for the Plaintiff's bank accounts. Scott and White trusted the Debtor to conduct the Plaintiff's financial affairs. There can be no dispute that the Debtor owed fiduciary duties to the Plaintiff and that the Debtor was acting in a fiduciary capacity.

*Defalcation*.  Defalcation requires a culpable state of mind involving knowledge of, or gross recklessness in respect to, the improper nature of the fiduciary behavior.[61] Prior to the Supreme Court's ruling in *Bulloch v. BankChampaign*, circuit courts, including the Fifth Circuit, held that defalcation required recklessness, or a "willful neglect of duty."[62] This willful neglect did not require actual intent, but was an objective, recklessness standard that asked "what a reasonable person in the debtor's position knew or reasonably should have known."[63] Stated simply, this standard required a "known breach of fiduciary duty, such that the conduct can be characterized as objectively reckless."[64]

Then, in *Bulloch*, the Supreme Court adopted a more stringent standard that required defalcation to rise to a greater level than "objectively reckless." The Supreme Court determined that defalcation requires an intentional wrong (improper conduct expressly known to the fiduciary)

---

[60] Partnership Agreement § 9.01.A.

[61] *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273 (2013) ("[D]ebts created by 'fraud' are associated directly with debts created by 'embezzlement.' Such association justifies, if it does not imperatively require, the conclusion that the 'fraud' referred to in that section means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement; and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality.") (quoting *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1878)).

[62] *In re Harwood*, 637 F.3d 615 (5th Cir. 2011); *Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel)*, 565 F.3d 963, 970 (6th Cir. 2009); *Follett Higher Educ. Grp., Inc. v. Berman (In re Berman)*, 629 F.3d 761, 766 (7th Cir. 2011).

[63] *In re Harwood*, 637 F.3d at 624.

[64] *Bullock*, 569 U.S. at 270–71.

or gross recklessness ("conscious disregard" to "a substantial and unjustifiable risk" that such conduct would violate a fiduciary duty).[65]  Generally, such a disregard involves a "gross deviation from the standard of conduct that a law abiding person would observe in the actor's situation."[66]

In this case, the Plaintiff did not prove the required culpable state of mind for the Debtor's failure to make his initial $10,000 capital contribution when acquiring his limited-partner interest. Although the Debtor testified untruthfully when he stated in a deposition that he had made his $10,000 contribution[67] (the Debtor now stipulates he did not[68]), that falsity damages the Debtor's credibility, but it does not establish the required culpable state of mind at the time he failed to make his contribution.

Second, the Plaintiff proved the required culpable state of mind to except from discharge the $101,378.75 conversion claim against the Debtor.  Based on the direct and circumstantial evidence contained in the record as summarized above, the Court finds and concludes that the Debtor knew his conduct was improper, or at the very least, he was grossly reckless by demonstrating a conscious disregard to a substantial and unjustifiable risk that taking the Plaintiff's funds for his personal use would violate his fiduciary duty to the Plaintiff.  The Debtor was not credible when he testified that Scott knew about the Debtor's personal use of the Plaintiff's funds and was "perfectly fine" with it.[69]

Third, although the Plaintiff met its burden to prove the required culpable state of mind for the Debtor's actions in usurping the *Strength for Service* opportunity from the Plaintiff and giving

---

[65] *Id*. at 273–74.

[66] *Id*. at 274.

[67] Pl.'s Ex. 3, at 45-46 (transcript of the Debtor's deposition).

[68] Stipulated Fact No. 7.

[69] 4/1/2019 Trial Tr. at 155.

it to Publishing, the Plaintiff failed to prove any damages.  Scott testified only to the gross revenues the Plaintiff would have received from printing and distributing the book, and he did not provide any testimony or other credible evidence of lost profit damages suffered by the Plaintiff.

### b)  *Embezzlement and larceny*

Embezzlement under § 523(a)(4) is the fraudulent appropriation of property by a person who is entrusted with that property or who has possession of it lawfully.[70]  To qualify as embezzlement under the Code, the property must have been appropriated with fraudulent intent, or knowledge that use of the property is not authorized.[71]  Although proof of fraudulent intent is required,[72] such intent may be inferred from the circumstances.[73]  However, it is improper to assume embezzlement where mere non-compliance with contractual terms could account for missing property.[74]

Larceny is the fraudulent and wrongful taking and carrying away of somebody else's property with the intent to convert it to the taker's use and to deprive the owner of the property permanently.[75]  Other than the manner in which the funds come into possession of a party, larceny does not differ from embezzlement.[76]

For the same reasons detailed above (that is, the Debtor knew his misappropriation of the Plaintiff's funds for his own personal expenses was not authorized), the Plaintiff has proven the

---

[70] *In re Miller*, 156 F.3d 598, 602 (5th Cir. 1998).

[71] *In re Ackerman*, 587 B.R. 750 (Bankr. D. Mass. 2017).

[72] *In re Rafai*, 2019 WL 3804456 at *31 (citing *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598 (5th Cir. 1998)). Scienter, or knowledge that personal use of the funds is not authorized, is the crux of the intent requirement in embezzlement cases.  *M&Z Enterprises v. Melo (In re Melo)*, 558 B.R. 521 (Bankr. D. Mass. Sep. 20, 2016).

[73] *In re Powers*, 261 F. App'x 719, 722 (5th Cir. 2008).

[74] *Werner v. Hofman (In re Hofman)*, 144 B.R. 459 (Bankr. D.N.D. 1992).

[75] *Smith v. Hayden (In re Hayden)*, 248 B.R. 519, 526 (Bankr. N.D. Tex. 2000).

[76] *Id.*

required culpable state of mind to except from discharge the $101,378.75 conversion claim against the Debtor pursuant to § 523(a)(4).

### 3. Section 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code excepts from a debtor's discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[77] This provision requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[78] The Fifth Circuit clarified the *Kawaauhau* standard and held that an injury is "willful and malicious" when there is either an objective substantial certainty of harm or a subjective motive to cause harm.[79]

The Plaintiff proved the required culpable state of mind to except from discharge the $101,378.75 conversion claim against the Debtor pursuant to § 523(a)(6). By misappropriating the Plaintiff's funds for his own personal use, knowing it was not allowed, and knowing that the Plaintiff needed the funds to continue operations, the Debtor had a subjective motive to harm the Plaintiff, or at the very least, there was an objective substantial certainty of harm.

The Plaintiff did not prove, however, the required culpable state of mind to except from discharge the Plaintiff's claim for the $10,000 contribution under § 523(a)(6). In addition, the Plaintiff failed to prove damages regarding the *Strength for Service* lost opportunity, so that claim under § 523(a)(6) also fails.

---

[77] 11 U.S.C. § 523(a)(6).

[78] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

[79] *In re Miller*, 156 F.3d 598, 602, 606 (5th Cir. 1998).

### C. Request for attorney's fees, costs, exemplary damages, and punitive damages

The Plaintiff has requested attorney's fees, costs, exemplary and punitive damages, and pre-and post-judgment interest.

First, under the American Rule, the prevailing party in a § 523 action does not ordinarily recover attorney's fees.[80]  The default application of that Rule can be overcome by statute or an enforceable contract.[81]  A contract enforceable under substantive non-bankruptcy law that allocates attorney's fees is enforceable in a bankruptcy case, unless the Bankruptcy Code provides otherwise.  The Plaintiff has not pointed to a statute that would entitle it to attorney's fees, and the Court can find nothing in the Partnership Agreement that awards attorney's fees to the prevailing party.  Even if the Partnership Agreement had a prevailing-party provision, the Court would exercise its discretion not to award attorney's fees to the Plaintiff given the limited success it had in this proceeding, including proving roughly only 1/3 of its damages of $294,867.86 that it asserted in its proposed findings of fact and conclusions of law.[82]

Second, the Court likewise exercises whatever discretion it may have to decline to award exemplary or punitive damages.

Finally, the Court will require the Plaintiff to file a separate motion for an award of pre- and post-judgment interest, with appropriate citations to any evidence or legal authorities upon which it relies in support of that request, and a detailed calculation of the pre-judgment interest figure.

---

[80] *Travelers Cas. & Surety Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 448 (2007).

[81] *Id.*

[82] *Plaintiff's Second Amended Proposed Findings of Fact and Conclusions of Law*, Adv. ECF No. 92, ¶ 25.

# V.   CONCLUSION

1.      The Plaintiff proved a nondischargeable claim against the Debtor of $101,378.75 under §§ 523(a)(4) and (a)(6).

2.      The Plaintiff failed to prove a nondischargeable claim against the Debtor under § 523(a)(2).

3.      The Plaintiff failed to prove any viable claims against Linda Edmonds or Publishing.

4.      The Plaintiff shall file a separate motion for an award of pre- and post-judgment interest within fourteen days after the entry of these Findings and Conclusions, with appropriate citations to any evidence or legal authorities upon which it relies in support of that request, and a detailed calculation of the pre-judgment interest figure.  If the Plaintiff does not timely file such a motion, it will be forever barred from requesting pre- and post-judgment interest.

5.      The Court will enter a final judgment after the issue of pre- and post-judgment interest is determined.

**# # # END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW # # #**